BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
LESLEY FARBY
Assistant Branch Director
BRIAN C. ROSEN-SHAUD
Trial Attorney
1100 L St NW, Rm 12022
Washington, DC 20530
Telephone: (202) 305-7667

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| WILLIAM C. SCHROEDER,<br><br>    Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | No. 2:22-cv-00172-MKD<br><br>**DEFENDANT'S MOTION TO DISMISS**<br><br>Hearing: November 9, 2022<br>Without Oral Argument |

## INTRODUCTION

Unlike the Senate, in which all States are represented equally, the House of Representatives was intended to provide for representation that was proportional to population. Plaintiff, a Washington resident, alleges that Congress must establish district sizes that minimize population disparities between States and claims that the statute that establishes 435 of Members of the House, 2 U.S.C. § 2a, unconstitutionally limits that effort. The principles of proportional representation and equality of district populations within a State have never been applied to require the sort of equality between States that Plaintiff claims is constitutionally compelled. In fact, evidence from the Founding era, and over two hundred years of practice,

Defendant's Motion to Dismiss - 1

confirms that significant disparities between district sizes in different States inhere in the constitutional order.  The Constitution sets only three requirements for the membership of the House, and the current apportionment of the House—including 2 U.S.C. § 2a—comports with those requirements.  Plaintiff does not allege otherwise.

Plaintiff asks the Court to usurp for itself the authority—granted by the Constitution to Congress and exercised by the political branches since 1790—to reapportion the entire House of Representatives and to increase the number of Members.  The Court lacks jurisdiction to grant this relief because Plaintiff's claim presents a political question that the Court cannot resolve according to legal principles.  Moreover, Plaintiff lacks standing because he has not alleged a particularized injury caused by the size of the House.  And the Court could not remedy his injury, were there one.  In any event, the Complaint fails to state a claim because 2 U.S.C. § 2a complies with the requirements in the Constitution.  The Court should dismiss the Complaint.

## BACKGROUND

Article I, Section 2, Clause 3 of the Constitution, as amended by the Fourteenth Amendment, provides that Representatives in the United States House of Representatives "shall be apportioned among the several States according to their respective numbers" and that "[t]he Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative." U.S. Const. art. I, § 2, cl. 3.  While the Constitution does not specify that Congress itself shall make the apportionment, Congress's power to do so "has always been acted upon[ ] as irresistibly flowing from the duty positively enjoined by the constitution." *Prigg v. Pennsylvania*, 41 U.S. (16 Pet.) 539, 619 (1842). Similarly, because the Constitution does not prescribe the total number of Representatives to be allocated among the States, Congress has also set the size of the House of Representatives.

Defendant's Motion to Dismiss - 2

From 1790 to 1910, Congress enacted new apportionment legislation "within two years after the taking of the census." H.R. Rep. No. 2010, 70th Cong., 2d Sess. 1 (1929) (1929 House Report). Until 1850, Congress first determined the number of persons that would be represented by each Representative, divided that number into the population of each State, assigned the resulting number of Representatives (less any fractional remainder) to each State, and summed those numbers to arrive at the overall size of the House of Representatives. *See United States Dep't of Com. v. Montana*, 503 U.S. 442, 449–51 (1992). During this period, Congress both regularly increased the number of persons represented by each Representative and allowed the size of the House to grow from 105 Members in 1790 to 233 Members in 1850. *See id.* at 457 & n.2.

After 1850, Congress began using an approach that set the overall size of the House of Representatives in advance and then proportionally distributed seats among the States. *See* Zechariah Chafee, Jr., *Cong. Reapportionment*, 42 Harv. L. Rev. 1015, 1025 (1929). That practice also resulted in steady growth of the House, because Congress regularly increased the total number of Members to prevent any State from losing a Representative. After the 1911 reapportionment, the House consisted of 435 Representatives. *See* Act of Aug. 8, 1911, ch. 5, § 1, 37 Stat. 13.

Following the 1920 census, efforts to reapportion the House of Representatives foundered because of conflicts between those who advocated the addition of dozens of Representatives to prevent several States from losing any Representatives, and those who objected that the proposed enlargements would cause the House to "become too large and unwieldy." 1929 House Report at 3. Opponents of those efforts summarized their objections as follows: "The membership of the House can not be increased indefinitely. A stop must be made some time, and in our opinion no time will ever be more opportune than the present, for we believe that a point has been reached where increased membership will result in decreased efficiency." H.R. Rep.

Defendant's Motion to Dismiss - 3

No. 312, 67th Cong., 1st Sess. 36 (1921) (minority views objecting to reported bill providing for 460 Members); *see also* H.R. Rep. No. 1173, 66th Cong., 3d Sess. 29 (1921) (minority views objecting to earlier bill providing for 483 Members because such an increase "will result in that body becoming more unwieldy and cumbersome than it is at the present time").  Because of those disagreements, Congress declined to reapportion the House of Representatives after the 1920 census.

Before the 1930 census, it was expected that "the size of the House would have to be increased to approximately 535" in order to prevent any State from losing a Representative, as a result of trends in population growth.  1929 House Report at 4.  But many Members of Congress voiced substantial opposition to such an increase.  *See, e.g., id.* at 8 (quoting Speaker of the House Nicholas Longworth: "Besides making necessary a remodeling of the south wing of the Capitol the House would become such an unwieldy body as to seriously interfere with the consideration and passage of proper legislation.").  In order to avoid the "possible deadlock" that could follow the 1930 census, *id.* at 4, Congress enacted 2 U.S.C. § 2a, the provision that Plaintiff challenges.

Section 2a provides for a "virtually self-executing" reapportionment process in the event that Congress fails to enact new apportionment legislation following a decennial census.  *Franklin v. Massachusetts*, 505 U.S. 788, 792 (1992).  The statute directs that, within the first week of a new Congress that follows a census, the President "shall transmit to the Congress a statement showing the whole number of persons in each State" and "the number of Representatives to which each State would be entitled under an apportionment of *the then existing number of Representatives* by the method known as the method of equal proportions, no State to receive less than one Member." 2 U.S.C. § 2a(a) (emphasis added).  Each State is entitled to that number of Representatives "until the taking effect of a reapportionment" by Congress.  2 U.S.C. § 2a(b).

Defendant's Motion to Dismiss - 4

Since 1930, Congress has considered and rejected proposals to increase the size of the House of Representatives. *See, e.g.*, *Increasing the Membership of the House of Representatives and Redistricting Cong. Dists.: Hearings on H.R. 841, 1178, 1183, 1998, 2531, 2704, 2718, 2739, 2768, 2770, 2783, 3012, 3176, 3414, 3725, 3804, 3890, 4068, 4609, 6431, 7355, 8075, 8498, 8616 and H. J. Res. 419 Before Subcomm. No. 3 of the House Comm. on the Judiciary*, 87th Cong., 1st Sess. (1961). Supporters of an increase have stressed the workload of each Representative and the substantial number of persons represented by each Member. *Id.* at 214. Opponents have continued to rely on a desire to maintain the "orderly" and "deliberative" nature of the House. *Id.* at 215.

Congress has continued to allow the self-executing process prescribed by Section 2a to operate and has not enacted a new reapportionment following any census since Section 2a was enacted. Accordingly, the size of the House of Representatives has remained at 435 Members since 1911—with the exception of a brief period after the admission of Alaska and Hawaii as new States. *See Montana*, 503 U.S. at 451 & n.24.

## LEGAL STANDARD

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Defendant brings a factual attack on the Court's jurisdiction. "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

Defendant's Motion to Dismiss - 5

Federal Rule of Civil Procedure 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotations omitted).

## ARGUMENT

### I. THE COURT LACKS JURISDICTION

The Court lacks jurisdiction to decide Plaintiff's claim that 2 U.S.C. § 2a violates the Constitution. In 2010, the Supreme Court considered a merits appeal in a substantially similar challenge to the statutory number of Members of the House of Representatives, after a three-judge district court determined that the provision passed constitutional muster but rejected the Government's argument that the issue was a nonjusticiable political question. *Clemons v. Dep't. of Com.*, 710 F.Supp.2d 570 (N.D. Miss. 2010), *vacated*, 562 U.S. 1105 (2010). The Supreme Court vacated the district court's judgment and remanded the case to be dismissed for lack of jurisdiction. *Id.* at 562 U.S. 1105. The same outcome should obtain here: the Court should dismiss the Complaint for lack of jurisdiction.[1]

### A. The Complaint Raises a Nonjusticiable Political Question

Plaintiff places an important policy dispute, historically resolved by Congress, before the Court. Resolving the dispute in this forum would offend the separation of powers. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Because Plaintiff's claim is not "of *legal* right, resolvable according to *legal* principles," the Complaint must be dismissed. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019).

---

[1] Plaintiff implicitly acknowledges that *Clemons* would be fatal to his claim. *See* Compl. ¶ 114 (suggesting that *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), abrogated *Clemons*).

Defendant's Motion to Dismiss - 6

Although "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), "[s]ometimes [ ] the law is that the judicial department has no business entertaining the claim of unlawfulness – because the question is entrusted to one of the political branches[.]" *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality opinion); *see also Marbury*, 5 U.S. at 170 ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."). This "political question" doctrine is "essentially a function of the separation of powers," *Baker*, 369 U.S. at 217, deriving from "the relationship between the judiciary and the coordinate Branches of the Federal Government," *id.* at 210. The doctrine excludes from judicial review controversies involving "policy choices" and "value determinations" constitutionally committed for resolution to Congress or the President. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

Six factors determine whether a particular case presents a political question: "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217. A claim only needs to offend one of these six "independent tests" for the Court to lack jurisdiction. *See Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir. 2005) (citing *Vieth*, 541 U.S. at 267). Plaintiff's claim fails at least four.

Defendant's Motion to Dismiss - 7

First, Article I, Section 2, Clause 3 of the Constitution, as amended by the Fourteenth Amendment, sets the only constraints on Congress's execution of the Clause: "[T]he number of Representatives shall not exceed one for every 30,000 persons; each State shall have at least one Representative; and district boundaries may not cross state lines." *See Montana*, 503 U.S. at 447–48 & n.14 (citing U.S. Const. Art. I, § 2). Congress's power to apportion Representatives "has always been acted upon, as irresistibly flowing from the duty positively enjoined by the constitution." *Prigg*, 41 U.S. at 619. Apart from the minimum of one Representative per State, the maximum of one Representative per 30,000 persons, and the prohibition on a district crossing state lines, the Constitution imposes no restrictions upon Congress's selection of the number of Representatives. Instead, "it was left completely in [Congress's] discretion, not only to increase, but to diminish the present number [65]." 2 J. Story, *Commentaries on the Constitution* § 648 (1833) (hereafter *Commentaries*). In light of the Constitution's commitment of the number of Representatives to the political process, a judicial decree striking down Congress's selection of the number would constitute an impermissible intrusion into that process.

Second, there exists a profound "lack of judicially discoverable and manageable standards for resolving" this case. *Baker*, 369 U.S. at 217. Population disparities among districts in different states inhere in the constitutional structure regardless of the number of Representatives. *Montana*, 503 U.S. at 463 ("[T]he need to allocate a fixed number of indivisible Representatives among 50 States of varying populations makes it virtually impossible to have the same size district in any pair of States, let alone in all 50."). The extent of those disparities is "a matter of degree." *Wendelken v. Bureau of the Census*, 582 F. Supp. 342, 343 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1437 (2d Cir. 1984).

The Supreme Court's recent decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), is instructive. There, the Court considered constitutional challenges to

state congressional redistricting maps that had been gerrymandered to favor Republicans in North Carolina and Democrats in Maryland. Among voters' allegations was that the redistricting plans impermissibly relied on voters' partisan affiliations to draw districts, violating Article I, Section 2's requirement that Members be chosen "by the People of the several States." *Id.* at 2492. The Supreme Court rejected plaintiffs' request to apply the "one-person, one-vote" principle of population equality among districts in a State to partisan gerrymandering claims, because "the Constitution supplies no objective measure for assessing whether a districting map treats a political party fairly." *Id.* at 2501. The Court concluded that the voters' claims were not justiciable because they were not "of *legal* right, resolvable according to *legal* principles." *Id.* at 2494. Similar here. The only constitutional standards that apply to the number of Members of the House of Representatives are that there must be at least one Representative per State, there may not be more than one Member for every 30,000 people, and no district boundary may cross state lines. No other legal standard applies, and extending the "one-person, one-vote" principle to challenges to apportionment between States would run afoul of the Supreme Court's guidance. *See id.* at 2501; *Whelan v. Cuomo*, 415 F.Supp. 251, 258 (E.D.N.Y. 1976) (recognizing that the one-person, one-vote principle "lends no support to plaintiff's" challenge to 2 U.S.C. § 2a); *see also Martin v. Maryland*, No. CIV.A. RDB-11-00904, 2011 WL 5151755, at *2–3 (D. Md. Oct. 27, 2011) (dismissing complaint requesting that Maryland receive representatives at a rate of 1:30,001 citizens because it raised a political question).

*Rucho* illustrates why the Supreme Court reversed the *Clemons* district court. The *Clemons* district court determined that a challenge to 2 U.S.C. § 2a was justiciable, rejecting the Government's argument that the case raised a political question. Key to the district court's analysis was *Davis v. Bandemere*, 478 U.S. 109 (1986), which permitted the possibility of partisan gerrymandering claims being heard

Defendant's Motion to Dismiss - 9

by federal courts. *Davis*, the district court believed, allowed federal judiciary to consider "more nuanced" apportionment challenges and to extend the "one-person, one-vote" principle beyond intrastate redistricting. *See Clemons*, 710 F.Supp.2d at 575. Regardless of the merits of the district court's 2010 ruling, *Rucho* abrogated *Davis* and forecloses that conclusion here. *See* 139 S.Ct. at 2497, 2508.

The Supreme Court in *Rucho* also looked to history to conclude that challenges to partisan gerrymanders were not justiciable. *Id.* at 2496 ("The Framers were aware of electoral districting problems and considered what to do about them. . . . At no point was there a suggestion that the federal courts had a role to play."); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (history and tradition "offer a meaningful guide to the types of cases that Article III empowers federal courts to consider"). A historical review here similarly indicates that the Court lacks jurisdiction. The Constitution provided for the initial composition of the House of Representatives, but required the "actual Enumeration [ ] be made within three Years after the first Meeting of the Congress," which was undertaken by the political branches. Art. I, § 2, cl. 3. *See Whelan v. Cuomo*, 415 F. Supp. 251, 256 (E.D.N.Y. 1976) (canvassing the history of the Constitutional Convention and concluding that "Congress was vested with authority to expand the number of members in the House and charged with the duty to apportion the membership among the several states"). James Madison wrote that "no political problem is less susceptible of a precise solution, than that which relates to the number most convenient for a representative legislature." J. Madison, *The Federalist No. 55*, *in The Federalist*, 372, 373 (Jacob E. Cooke ed. 1961). The Framers wisely left this most imprecise political decision for Congress and the Executive, rather than the Courts. *See supra* at 1–5 (explaining nearly 150-year history of political branches adjusting the size and composition of the House of Representatives). There is no countervailing history or tradition of federal judicial involvement in setting the number of Members of the House.

Defendant's Motion to Dismiss - 10

Third, the history of, and constitutional basis for, leaving apportionment decisions to the political branches also confirms the inherent "policy determination" at issue, which is "of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. Plaintiff asks this Court to "direct" Congress to reconstitute membership of the House either with a sufficient number of seats to allow for near-equal districts or according to a set ratio of member-per-unit-of-population. Compl. ¶ 147. Again, "no political problem is less susceptible of a precise solution, than that which relates to the number most convenient for a representative legislature." *The Federalist* No. 55, at 373 (Jacob E. Cooke ed., 1961). A variety of highly subjective and imprecise policy considerations factor into the solution to this "political problem." *See, e.g.*, J. Madison, *The Federalist No. 58*, *in The Federalist*, 391, 396 (Jacob E. Cooke ed. 1961) ("[A]fter securing a sufficient number for the purposes of safety, of local information, and of diffusive sympathy with the whole society, they will counteract their own views by every addition to their representatives.") (emphasis removed); 2 *Commentaries* § 652 ("The question [of the proper number of Representatives] then is, and for ever must be . . . a mixed question of sound policy and discretion, with reference to its size, its population, its institutions, its local and physical condition, and all the other circumstances affecting its own interests and convenience.").

Such a "highly subjective" policy determination is not appropriate for judicial resolution. *Gilligan v. Morgan*, 413 U.S. 1, 14 (1973) ("The relief sought by respondents . . . is beyond the province of the judiciary. . . . This case relates to prospective relief in the form of judicial surveillance of highly subjective and technical matters[.]") (Blackmun, J., concurring). This case is to similar *Evans v. Stephens*, where the Eleventh Circuit determined that a challenge to a recess appointment was, in part, nonjusticiable. 387 F.3d 1220, 1227 (11th Cir. 2004). Once the Eleventh Circuit determined that the appointment satisfied the constitutional requirements, it declined to weigh in on plaintiffs' claim that the appointment failed to

Defendant's Motion to Dismiss - 11

show adequate deference to the Senate. *Id.* ("This kind of argument presents a political question. . . . These matters are criteria of political wisdom and are highly subjective."). Here, the Court likewise lacks the political wisdom or authority to weigh in on Plaintiff's request that the Court go beyond the three constitutional criteria for apportionment of the House.

Fourth, Plaintiff's request for relief demonstrates a fundamental "lack of the respect due coordinate branches of government." *See Baker*, 369 U.S. at 217. Plaintiff asks this Court for an order restructuring Congress at its most foundational level. Such massive reformulation of a coordinate branch of the federal government "savours too much of the exercise of political power to be within the proper province of the judicial department." *Cherokee Nation v. Georgia*, 30 U.S. 1, 20 (1831); *see also Gilligan*, 413 U.S. at 5 (rejecting a "broad call on judicial power to assume continuing regulatory jurisdiction" over the executive).

### B.  Plaintiff Lacks Standing

To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992)). Plaintiff cannot satisfy the first and third prongs.

#### 1.  *Plaintiff has not suffered an individualized injury.*

Plaintiff fails to demonstrate any actual or imminent injury caused by 2 U.S.C. § 2a, so the Complaint must be dismissed. *See Lujan*, 504 U.S. at 560. Plaintiff does not specify his individual injury, but his complaint appears to be that he is not adequately represented in the House because of the small size of the body. *See* Compl. ¶ 143. As a matter of fact, Plaintiff (like all Washington residents) would not be better represented under the largest-possible House that would provide for the most equal apportionment between States. Imagine the Court ordered that the House be

Defendant's Motion to Dismiss - 12

reapportioned so that Members represent only 30,001 individuals, rather than the current ratio of one Member to 761,169 individuals.  The House would comprise 11,047 Representatives.  Washington's 7,705,281 residents would be represented by 257 Members, 2.32% of the total House.  Currently, Washington has 10 of 435 Representatives, which is 2.30% of the total House.  It is not clear, and Plaintiff has not attempted to establish, how such a de minimis difference in representation could be an injury.  (As a separate policy matter, Plaintiff may reasonably prefer such a scheme because, for example, he would only have to compete with 30,000 fellow residents for the attention of his Representative.  But Plaintiff's claim here is based only on the unequal apportionment *between States*, and Washington's share of Representatives would be virtually unchanged under a new scheme.)

      What really seems to motivate this case, of course, is not an actual representative harm, but Plaintiff's philosophical disagreement with Congress's apportionment decision.  Plaintiff's belief that Congress should perform its constitutional duties differently than it has is no more than a generalized grievance that cannot support standing.  The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74 (citing cases); *see also Lance v. Coffman*, 549 U.S. 437, 439 (2007); *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 64 (1997) ("An interest shared generally with the public at large in the proper application of the Constitution and laws will not [create standing]."). "The actual-injury requirement" of standing "serve[s] the purpose" "of preventing courts from undertaking tasks assigned to the political branches." *Lewis v. Casey*, 518 U.S. 343, 357 (1996).  Where, as here, no plaintiff identifies an individualized harm to establish standing, it "gives support to the

Defendant's Motion to Dismiss - 13

argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process." *United States v. Richardson*, 418 U.S. 166, 179 (1974).

> 2. *Even if Plaintiff had been injured, the Court could not redress the harm.*

Even if Plaintiff had alleged, and could establish, injury, neither of his two requested forms of relief would redress his injury. First, a declaration that 2 U.S.C. § 2a violates the Constitution, without more, would not redress his injury. "A declaration, although undoubtedly likely to benefit the plaintiffs psychologically, is unlikely by itself to remediate their alleged injuries absent further court action." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020)*; reh'g en banc denied*, 986 F.3d 1295 (9th Cir. 2021). Though the Court could declare that 2 U.S.C. § 2a is unconstitutional, more would be required to reconstitute the House.

Plaintiff would also have the Court "direct[ ]" Congress to either "create a ratio of member-per-unit-of-population applicable equally to each and every of the several States" or to create "sufficient overall whole number of districts to be apportioned to provide roughly equal district sizes among the States." Compl. ¶ 147. Entering either order would require this Court to supervise a "complex policy decision[ ] entrusted, for better or worse, to the wisdom and discretion of the executive and legislative branches." *See Juliana*, 947 F.3d at 1171. And such an order would raise many questions: How "roughly equal" would populations per district need to be? There is no apparent legal standard for the Court to make that decision.[2] Or how would the Court decide what "whole number" of districts Congress should create? For either

---

[2]   In any event, the Supreme Court has held that fixed numerical standards are wholly "inconsistent" with the "one-person, one-vote" principle that Plaintiff attempts to incorporate here. *See Kirkpatrick v. Preisler*, 394 U.S. 526, 530 (1969).

Defendant's Motion to Dismiss - 14

form of relief, would the Court retain jurisdiction to supervise the reallocation of Representatives after each decennial census? These questions are decisions that "must be made by the People's 'elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country.'" *Id.* at 1172 (*quoting Collins v. City of Harker Heights*, 503 U.S. 115, 128–29 (1992)). In any event, Plaintiff's failure to answer those questions in the Complaint falls short of the pleading requirement that standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan*, 504 U.S. at 561.

## II. THE COMPLAINT ALSO FAILS TO STATE A CLAIM

Even if the Court determines that it has jurisdiction, the Court should dismiss the Complaint for failure to state a claim because Congress has not abused its broad discretion to fix the size of the House of Representatives.

As explained above, the Constitution imposes only three limitations on Congress's apportionment discretion. "The number of Representatives shall not exceed one for every 30,000 persons; each State shall have at least one Representative; and district boundaries may not cross state lines." *Montana*, 503 U.S. at 447–48. Plaintiff does not allege that Congress has created a district smaller than 30,000 inhabitants. (Congress has not.) Plaintiff does not allege that any State has fewer than one Representative. (No State does.) Plaintiff does not allege that any district boundaries crosses state lines. (No district does.) 2 U.S.C. § 2a, as applied following the 2020 census, meets the constitutional standard.

Consistent with those minimal restrictions, the Supreme Court has repeatedly recognized that "the Constitution vests Congress with wide discretion over apportionment decisions." *Wisconsin v. City of New York*, 517 U.S. 1, 15 (1995). As the Court has explained, Congress's broad discretion in that area flows from the need for "compromise between the interests of larger and smaller States," which "motivated the original allocation of Representatives specified in Article I, § 2" and continued to

Defendant's Motion to Dismiss - 15

1  guide all subsequent efforts "to achieve a fair apportionment for the entire country."
2  *Montana*, 503 U.S. at 464.

3      Courts have unanimously rejected similar challenges to 2 U.S.C. § 2a.  The U.S.
4  District Court for the Southern District of New York readily dismissed a plaintiff's
5  claim that the House of Representatives must consist of roughly 7,000 members to
6  ensure population equality among interstate Congressional districts.  *Wendelken*, 582
7  F. Supp. at 343 (S.D.N.Y. 1983).  "The inequality of which [plaintiff] complains
8  inheres in our constitutional structure."  *Id.*  "So long as the Constitution requires
9  apportionment of seats in the House of Representatives among the *states*, inequalities
10 of voting power of the kind mentioned above are inevitable in view of population
11 differences; the question is a matter of degree."  *Id.*  "The decision to limit the size of
12 the House of Representatives to 435 members is expressly committed to the discretion
13 of Congress."  *Id.* (dismissing complaint for failing to state a claim).

14     The *Clemons* district court likewise rejected the merits of plaintiffs' challenge
15 to the size of the House.  The Court reviewed the history of the Constitutional
16 Convention, finding "no consideration that ever-increasing numbers of members were
17 also needed to reduce disparity in the size of districts among the States."  *Id.* at 581.
18 The court also found "many speakers admitting, and then bemoaning, that Congress
19 had unfettered discretion in setting the size."  *Id.*  The Court reviewed more modern
20 jurisprudence and practice and concluded that 2 U.S.C. § 2a reflected a "practical
21 compromise . . . embedded in the Constitution itself" that was "valid."  *Id.* at 589
22 (granting summary judgment to the Government).

23     In sum, by fixing the number of Representatives at 435, apportioning at least
24 one Representative to each State, and not crafting any district boundaries that cross
25 State lines, Congress has acted consistently with the Constitution.  *Montana*, 503 U.S.
26 at 463–64.  The Complaint fails to state a claim.

### III. THE COURT NEED NOT ESTABLISH A THREE-JUDGE PANEL

"[A] three-judge court is not required where the district court itself lacks jurisdiction of the complaint or the complaint is not justiciable in the federal courts." *Shapiro v. McManus*, 577 U.S. 39, 43–44 (2015). Such is the case here. *See supra* I–II. *Cf. Clemons*, 562 U.S. at 1105 (holding that three-judge district court lacked jurisdiction to hear similar challenge to 2 U.S.C. § 2a). Admittedly, claims must be "essentially fictitious, wholly insubstantial, obviously frivolous, and obviously without merit" for this exception to apply. *Shapiro*, 577 U.S. at 45-46 (quoting *Goosby v. Osser*, 409 U.S. 512, 518 (1973)). Though Plaintiff raises a significant policy question, the legal question presented by the complaint can be disposed of readily: federal courts lack jurisdiction to resolve this political question. In the alternative, 2 U.S.C. § 2a clearly complies with the minimal requirements that the Constitution establishes for the composition of the House of Representatives. *See Whelan v. Cuomo*, 415 F.Supp. 251 (E.D.N.Y. 1976) (declining to convene a three-judge district court because plaintiff's constitutional challenge to 2 U.S.C. § 2a was without merit); *see also Martin*, No. CIV.A. RDB-11-00904, 2011 WL 5151755, at *2–3 (dismissing complaint challenging application of 2 U.S.C. § 2a to Maryland without convening three-judge district court); *Wendelken*, 582 F. Supp. at 343 (same as to challenge to the size of the House established by 2 U.S.C. § 2a).

### CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

1  DATED this 19th day of September 2022.

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Brian Rosen-Shaud*
BRIAN C. ROSEN-SHAUD
Trial Attorney (ME Bar No. 006018)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 305-7667
Brian.C.Rosen-Shaud@usdoj.gov

Attorneys for Defendant

Defendant's Motion to Dismiss - 18

## *Certificate of Service*

I hereby certify that on September 19, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

| NAME & ADDRESS | Method of Delivery |
|---|---|
| William C. Schroeder<br>KSB Litigation, P.S.<br>510 W. Riverside Ave., Ste. 300<br>Spokane, WA, 99201<br>Email: wcs@KSBlit.legal<br>*Plaintiff* | ☒CM/ECF System<br>☐Electronic Mail<br>☐U.S. Mail<br>☐Other: _____ |

*/s/ Brian Rosen-Shaud*
BRIAN C. ROSEN-SHAUD

Defendant's Motion to Dismiss - 19